## Elkay Steel Co. v. Collins

*Metz, Cook, Hanna & Kelly,* for plaintiff.

*Charles D. Coll* and *Leonard Mendelson,* for defendant.

SOFFEL, J., November 29, 1957.—This case is before the court on defendants' motion to quash the writ of ne exeat regno issued by the court.

Elkay Steel Company, plaintiff, brought suit in equity against M. Dennis Collins and Rena R. Collins, his wife, to recover the sum of $60,165, being the balance allegedly due of a sum of $90,015 advanced by plaintiff to defendant, M. Dennis Collins, upon the latter's fraudulent representations.

On May 27, 1957, this court granted the motion of plaintiff's counsel for a writ of ne exeat regno prohibiting defendants from leaving the jurisdiction without permission of the court and requiring them to post bonds in the sum of $11,000, subsequently increased to $25,000.

On August 14, 1957, defendants filed a motion to quash the writ of ne exeat. On September 4, 1957, a hearing was had on said motion. The parties, with the exception of M. Dennis Collins, were present in court and were represented by counsel. Mr. A. C. Kramer, president of plaintiff company, testified concerning his business transactions with defendant, M. Dennis Collins, and was cross-examined by the attorneys representing defendants. On September 5, 1957, this court filed its order refusing defendants' motion to quash the writ of ne exeat.

The writ of ne exeat regno, commonly referred to as ne exeat, is an ancient writ of historic English origin. The origin of the writ of ne exeat regno is obscure. This common law writ is discussed at length in the Pennsylvania case of Lit Bros. v. Rubin, 44 D. & C. 110 (1942). In this case, Judge Winnet, of the Munici-

pal Court of Philadelphia, refused to grant the writ sought in aid of the collection of a store bill.

We cite these excerpts from Judge Winnet's opinion:

"It was known as a 'writ de Securitate invenienda quod se non divertat ad partes exteras, sine Lecentia Regis' and its first use is ascribed to the Constitutions of Clarendon, passed in the 10th year of Henry II's reign (1167), and extended to ecclesiastics only, to prevent them from quitting the realm without the king's license. It was framed 'to prevent too strict an intercourse between that body and the Papal See': Beames on the Writ of Ne Exeat Regno, p. 10 (1821). Its use subsequently was sometime between the reigns of John and Edward I, as a high prerogative writ, founded on the duty of the subject to defend the king and his realm. 3 Story on Equity Jurisprudence (14th ed.), sec. 1911, says it is thought that its use as a prerogative writ was later than King John's reign, since the Magna Carta (1215) granted the unlimited freedom to all subjects to go from and return to the kingdom at their pleasure. Its original use, however, as a prerogative writ was applied only 'to great political objects and purposes of State for the safety or benefit of the realm': 3 Story on Equity Jurisprudence, sec. 1913.

"The time when the writ was first applied to mere civil purposes in aid of the administration of justice is not exactly known and seems to be as obscure as its primitive existence. As early as the reign of Queen Elizabeth, in some unexplained manner, the practice of using the writ for the enforcement of private rights had become established. Certainly in this country it was never treated as a prerogative writ but as a writ of right in the cases in which it is properly grantable.

"The writ of ne exeat, also known as ne exeat regno, may be issued wherever there is a definite equitable debt existing and due from defendant at the time, and

defendant is about to leave the State so that the payment of the debt is liable to be defeated: 1 Whitehouse on Equity Practice, sec. 429, p. 691. Both the English and the American courts have established and adhered to the rule that ne exeat will issue only for the enforcement of equitable pecuniary demands, presently payable: Jenkins v. Parkinson, 2 My. & K. 4, 39 Eng. Repr. 846; Moore v. Valda, 151 Mass. 363; McGee v. McGee, 8 Ga. 295; Rhodes v. Cousins, 6 Rand (Va.) 188; Smedberg v. Mark, Exec., 6 Johns Ch. (N.Y.) 138; Williams et al. v. Williams, 3 N. J. Eq. 130; De Rivafinoli v. Corsetti, 4 Paige (N.Y.) 264; Caughron et al. v. Stinespring et ux. 132 Tenn. 636. The use of the writ was not extended to legal debts by codes which abolish the distinction between actions at law and equity: Davidor v. Rosenberg, 130 Wis. 22; Bonesteel v. Bonesteel et al., 28 Wis. 245. Two exceptions to the rule have been recognized. The writ has been granted to a wife to prevent departure of her husband to evade payment of alimony: Lamar v. Lamar, 123 Ga. 827; Bronk v. State, 43 Fla. 461. The writ has also been granted in actions for an account to keep within the jurisdiction a defendant who admits that there is a sum due plaintiff but denies that it is as large as plaintiff claims: McMartin v. Bingham, 27 Iowa 234; Dean v. Smith, 23 Wis. 483; MacDonough v. Gaynor et al., 18 N. J. Eq. 249; Jones v. Sampson, 8 Ves. Jr. 593, 32 Eng. Repr. 485.

"In Pennsylvania there seem to be only two reported cases involving the use of ne exeat": Torlade v. Barrozo, 1 Miles (Pa.) 366 (1830) and Dransfield v. Dransfield, 6 Phila. 143 (1866).

It is thus apparent that the writ ne exeat is available "only for enforcement of equitable pecuniary demands presently payable whenever there is a definite equitable debt existing and due from defendant at the time."

38 Am. Jur. 618, 619, states the purpose of this writ as follows:

"The writ of ne exeat is a writ which issues from a court of equity to restrain a person from going beyond the confines of the country, or more especially, from going beyond the limits of the jurisdiction of the court, until he has satisfied the plaintiff's claim or has given bond for the satisfaction of the decree of the court.

"The writ of ne exeat is in the nature of equitable bail; its essential object is to detain the person of the defendant in order to compel him to perform the decree of the court in cases where his departure would endanger the rights of the complainant or prevent the effectual enforcement of the order of the court."

In the instant case, defendant, M. Dennis Collins, signed a written confession, dated March 26, 1957, in which he admitted that all the money received from plaintiff was procured by forgery, misrepresentation and other species of fraud.

In its complaint, plaintiff does not seek to recover a debt due in law but an equitable claim for accounting growing out of the admitted fraud of defendant, M. Dennis Collins.

We believe this is a case in which equitable jurisdiction properly attaches.

In Fishell v. McDonald, 163 Pa. Superior Ct. 251, at page 255, it was held:

" 'In this Commonwealth chancery always assumes jurisdiction in relief of fraud and this is so whether or not the remedy in equity is more efficacious or adequate than an action at law': Zoni v. Importers and Exporters Ins. Co. of N. Y., 338 Pa. 165, 167, 12 A. 2d 575. See also Custis v. Serrill, 303 Pa. 267, 154 A. 487, and N. Y. Life Ins. Co. v. Brandwene, 316 Pa. 218, 172 A. 669. 'As a general rule courts of equity have jurisdiction to relieve against every species of fraud . . . Its process is plastic and may be readily modeled to

suit the exigencies of the particular case. A court of equity proceeds with but little regard to mere form. It moves with celerity and seizes the fruits of a fraud in the hands of the wrongdoer. . . .': Clauer v. Clauer, 22 Pa. Superior Ct. 395, 399."

More colorful words of Mr. Justice Musmanno appear in Weissman v. Weissman, 384 Pa. 480 at pages 484 and 485:

"The plaintiff in the case at bar founds his whole case on the assertion of fraud practiced by the defendant. Equity has ways of seeking out fraud and of affording the appropriate remedial relief which are often beyond the potentialities of actions at law. 'Equity courts are not bound by strict common law rules. They possess broad powers and should exercise them so as to do substantial justice. Equity looks beneath the rigid rules of the law to seek substantial justice. It has power to prevent such rules from working an injustice, and will depart therefrom whenever it is necessary to accomplish the ends of justice.' Volume 30 Corpus Juris Secundum, Equity, sec. 89, p. 456.

"To borrow an illustration from the world of aviation, equity is to the law what the helicopter is to the conventional airplane. Equity can travel in any direction to achieve its objective of truth, and when it has found truth it can land on terrain which often would be utterly futile and unapproachable to formalistic law. And on that terrain of ascertained fact, equity surveys the whole situation and grants the relief which justice and good conscience dictate.

"In the case of Leahey v. Leahey, 309 Pa. 347, 353, this Court supplied the answer to the contention presented by the appellant here, namely, 'They (appellants) say the suit should have been brought at law; that the bill is a mere ejectment bill, no fraud being averred as to the execution of the deed. This position ignores the true situation. Plaintiffs' contention is that

defendants fraudulently took possession of and recorded the deed which had never become effective by delivery. As the chancellor points out, this allegation of fraud brings the case within equity jurisdiction under section 39 of the Act of June 13, 1840, P. L. 666 (Act of February 14, 1857, P.L. 39, extending its provisions throughout the State).' "

The writ was granted on plaintiff's affidavit, setting forth circumstances to support the conclusion that defendants were about to leave the jurisdiction of the Commonwealth of Pennsylvania in order to render the process of the court in this action futile and nugatory.

The evidence produced at the hearing held September 4 on the motion to quash the writ established:

(1) The wife defendant came to Pittsburgh from Detroit in June 1955 and the husband defendant ir January 1956.

(2) During the last part of 1955 the husband defendant had been in jail in Detroit on what is referred to in Michigan as "body execution" issued on charges of the fraudulent procuring and misappropriation of large sums of money, some $200,000, from various persons. The wife defendant had knowledge of this fraud.

(3) The nature and means of the fraud and deception practiced on plaintiff in the procuring of the money in this case in Pittsburgh were fully detailed by plaintiff.

(4) The fraud in the instant case was accomplished between June 1956 and January 1957.

The evidence is sufficient to support the reasonable conclusion that defendants, despite all protestations to the contrary, were in all probability about to leave Pennsylvania in order to avoid responsibility for the fraud which had been perpetrated.

Defendants' motion to quash the writ of ne exeat will therefore be refused.